## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 20 2018, 6:08 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John T. Wilson
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# I N   T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of:<br><br>T.G. (Minor Child)<br><br>And<br><br>T.G. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | February 20, 2018<br><br>Court of Appeals Case No. 48A04-1708-JT-1771<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable George G. Pancol, Judge<br><br>Trial Court Cause No. 48C02-1610-JT-81 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, T.G. (Father), appeals the termination of his parental rights to his minor child, T.G. Jr. (Child).

We affirm.

# ISSUE

Father raises one issue on appeal, which we restate as: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of Father's parental rights.

# FACTS AND PROCEDURAL HISTORY

Father and M.F. (Mother)[1] are the biological parents of the Child, born on August 28, 2011. After the Child was born, Father and Mother lived together in a three-bedroom apartment with the Child and Mother's children from previous relationships, T.F. and A.F. The apartment was leased by Father's mother, and A.F. reported that eight children and eight adults lived there, with the Child and his half-siblings sleeping in a closet. Father did not have regular employment but would wash cars "off and on[] when [he] need[ed] a little money." (Tr. Vol. II, p. 81). Mother had a part-time job, but it appears that the

---

[1] Mother's parental rights to the Child were terminated on July 6, 2017. Mother is not a participant in this appeal, but facts pertaining to Mother are included where appropriate.

individuals residing in the apartment largely relied on the social security income of Father's mother.

[5] On August 14, 2013, Father pled guilty to battery with a deadly weapon and battery resulting in serious bodily injury, both Class C felonies, for an incident that had occurred in December of 2011. At the same time, he also pled guilty to charges of intimidation as a Class C felony, pointing a firearm as a Class A misdemeanor, and carrying a handgun without a license as a Class A misdemeanor for events that occurred in December of 2012. The two sets of crimes involved two different victims. On August 26, 2013, Father was sentenced to an aggregate term of twelve years, to be executed in the Indiana Department of Correction (DOC).

[6] Shortly after Father was sentenced to the DOC, in October of 2013, Mother contacted the Madison County office of DCS and requested that her three children be placed in foster care. Mother described that she was currently homeless and unable to provide for the children's needs. With Father also unavailable to care for the children, DCS took them into custody on October 5, 2013.[2]

---

[2] Father is not the biological parent of either T.F. or A.F., and although facts pertaining to the Child's half-siblings are included for background information, they are not the subject of this appeal. Prior to his incarceration, Father had acted as a father-figure to T.F. and A.F. At the time of removal, T.F.'s and A.F.'s fathers were also incarcerated. CHINS and termination proceedings for T.F. and A.F. have been concurrent with the Child's.

[7]     On October 8, 2013, DCS filed a petition alleging that the Child is a child in need of services (CHINS) based on Father and Mother's inability to care for the Child. That day, the trial court conducted an initial and detention hearing, at which Mother appeared but Father did not. Mother waived her right to counsel and admitted the allegations contained in the CHINS petition. Accordingly, the trial court adjudicated the Child to be a CHINS. On November 6, 2013, the trial court held a continued initial/detention hearing as to Father, at which time Father also admitted that the Child is a CHINS. Also on November 6, 2013, the trial court conducted a dispositional hearing and granted wardship of the Child to DCS. The trial court determined that the Child should remain in foster care, with his half-siblings, and ordered both parents to comply with a parental participation plan. Specifically for Father, the trial court ordered him to "comply with any programs offered by the [DOC] to increase his ability to be a safe and appropriate parent." (DCS Exh. 4). The trial court further ordered both Father and Mother to obtain and maintain a suitable and legal source of income and a stable residence, as well as to maintain weekly contact with DCS.

[8]     In January of 2014, Mother was convicted of promoting prostitution, a Class C felony, and received a two-year suspended sentence pursuant to her plea agreement. Otherwise, Mother complied with her court-ordered reunification services. As a result, in March of 2015, the Child and his half-siblings were placed in Mother's care. However, by July of 2015, Mother was again unable to provide for the children's needs, so DCS placed them back in foster care. Thereafter, Mother did not engage in reunification services.

[9] For the duration of the CHINS case, Father remained incarcerated and never saw the Child. Father did, however, maintain weekly phone calls with the Child for a period of time, and the Child's foster mother attempted to keep Father updated on the Child's activities. Father did not maintain regular contact with DCS, and DCS did not endeavor to initiate communications with Father. Father did send at least one letter to DCS, requesting that the Child be placed with a paternal aunt; DCS responded in kind, indicating that it was best for the Child to remain placed with T.F. and A.F. Father also claimed that he attempted to call DCS in 2015 but "couldn't get in touch with anybody." (Tr. Vol. II, p. 82). At some unknown point, Father stopped calling the Child— purportedly because he did not have money in his prison account to make calls.

[10] As to Father's attempts at reunification, he claimed to have completed both a parenting class and an anger management class offered by the DOC, although he did not provide the certificates of such to DCS. Father explained that the DOC policy permits prisoners to engage in only one course at a time. Thus, after completing the parenting class and the anger management class, Father initiated a literacy course as a prerequisite for obtaining his GED. However, before completion of the literacy course, in November of 2015, Father assaulted another inmate and was moved to an administrative segregation unit. Prior to the assault, Father had accumulated "probably like fifteen write-ups" for other DOC violations. (Tr. Vol. II, p. 88). His last offense, however, resulted in the loss of a year of credit time. Furthermore, the move to the isolated administrative segregation unit prohibited Father from engaging in any classes;

instead, he was confined to his cell for twenty-three hours of each day, spending most of his time "sitting on [his] bunk watching [television]." (Tr. Vol. II, p. 89).

[11] On November 3, 2016, DCS filed a petition to terminate the parental rights of Father and Mother. On May 9, 2017, the trial court conducted a hearing on DCS's termination petition. Father appeared by telephone; Mother did not attend. By the time of the termination hearing, Father had been in the DOC's administrative segregation unit for approximately eighteen months and still had "ninety days left" before he would be released to the general population and could resume his literacy course. (Tr. Vol. II, p. 90). Father testified that his release date was scheduled for January 10, 2021, but he was administratively appealing the loss of his credit time. Father stated that he had a bond with the Child, who used to "chas[e] after me everywhere I went." (Tr. Vol. II, p. 81). Father expressed that he did not want to lose his parental rights and requested that the Child be placed in the care of a paternal uncle pending his release. Conversely, DCS and the Child's court-appointed special advocates (CASAs) testified in favor of terminating the parent-child relationship. Evidence was presented that, despite all three children struggling with behavioral issues, they had demonstrated marked improvement in their foster care placement and shared a bond. The children's foster mother indicated that while she would endeavor to maintain the children's relationships with their biological families, she loved them, was committed to keeping them placed together, and was willing to adopt all three.

On July 6, 2017, the trial court issued Findings of Fact, Conclusions of Law, and Judgment Terminating the Parent-Child Relationship. The trial court concluded, in pertinent part, that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside of Father's care will not be remedied; there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being; and it is in the Child's best interests that the parent-child relationship be terminated.

Father now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Father challenges the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). It is well established that "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Yet, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* However, we acknowledge that the termination of a

parent-child relationship is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

[15] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. As such, on appeal, we do not reweigh evidence or assess the credibility of witnesses. *Bester*, 839 N.E.2d at 147. We "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* In addition, because the trial court entered special findings of fact and conclusions thereon, we rely on the standard set forth in Indiana Trial Rule 52(A), whereby we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." In applying this two-tiered standard, we must first determine whether the evidence supports the trial court's findings; second, we consider whether the findings support the judgment. *Id.* We will find a judgment to be clearly erroneous "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Id.*

## II. *Termination of Parental Rights Statute*

[16] In order to terminate a parent's rights to his or her child, DCS must prove:

> (A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

* * * *

(iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.*

[17] In this case, Father concedes that the Child has been removed from the home for the requisite period of time pursuant to Indiana Code section 31-35-2-

4(b)(2)(A) and that DCS has established a satisfactory plan for the care and treatment of the Child pursuant to Indiana Code section 31-35-2-4(b)(2)(D). He thus argues that DCS failed to establish the remaining two elements: (1) that there is a reasonable probability either that the conditions resulting in the Child's removal or continued placement out of his custody will not be remedied or that the continuation of the parent-child relationship poses a threat to the Child's well-being;[3] and (2) that termination is in the Child's best interests.

A. *Remediation of Conditions*

Indiana Code section 31-35-2-4(b)(2)(B) requires DCS to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21. The two relevant inquiries in this case are whether there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside of the home will not be remedied or whether there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being. Here, we elect to dispose of this statutory element by reliance on Father's remediation of the conditions that resulted in the Child's removal and continued placement outside of Father's care and custody.

In determining whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside the home and subsequently determine whether there is a

---

[3] DCS did not allege that the Child had twice previously been adjudicated a CHINS to satisfy Indiana Code section 31-35-2-4(b)(2)(B).

reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). In making these decisions, a court "must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted) (internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[20] Here, the Child was taken into DCS's custody and remained in foster care for three and one-half years (as of the time of the termination hearing) as a result of Mother's admitted inability to provide shelter and other necessities for the Child

and Father's inability to do the same based on his incarceration. In support of its determination that there is a reasonable probability that the conditions resulting in the Child's removal and prolonged placement out of Father's care would not be remedied, the trial court found that

> [o]ther than the weekly calls, Father has had no meaningful participation in services, has not complied with services or the court's dispositional orders, and has had no meaningful or consistent visitation with the [C]hild, from the beginning of CHINS proceedings through to the date of the termination trial on the termination petition.

(Appellant's App. Vol. II, p. 24).

[21] Father now disputes the trial court's findings that he has not meaningfully participated in services or complied with the trial court's dispositional orders. Rather, Father points to the dispositional order's directive that he "comply with any programs offered by the Department of Correction[] to increase his ability to be a safe and appropriate parent" and notes his completion of a parenting class and an anger management class, as well as participation in a literacy program and his intent to complete the GED program upon his release from the administrative segregation unit. (DCS Exh. 4). Father also challenges the trial court's determination that he has not maintained meaningful contact with the Child, as the evidence establishes that he regularly called the Child every Sunday throughout most of the CHINS case. Father further contends that the trial court improperly assessed his lack of parental fitness based solely on the fact of his incarceration. Father relies on *In re G.Y.*, 904 N.E.2d 1257 (Ind.

2009)*, and *K.E.*, 39 N.E.3d at 641, where our supreme court twice upheld the parental rights of an incarcerated parent, as a basis for according him additional opportunity to establish that he can provide permanency for the Child upon release.

[22] Father is correct that our courts have previously recognized that "incarceration is an insufficient basis for terminating parental rights." *K.E.*, 39 N.E.3d at 643. In the cases cited by Father*, In re G.Y.* and *K.E.*, the supreme court found insufficient evidence to support the termination of parental rights based on the substantial efforts taken by the incarcerated parents and their marked improvements by the time of the termination hearing. Specifically, in *In re G.Y.*, 904 N.E.2d at 1262, the mother was incarcerated for a serious drug offense that she had committed prior to the child's conception but "for the first [twenty] months of [the child's] life" was nothing "but a fit parent." *Id.* While incarcerated, the mother completed drug courses, engaged in counseling, demonstrated her sobriety, completed a parenting class, and was "actively participating in an inmate to work mate program . . . which results in an apprenticeship, certification, and job placement after release from prison." *Id.* (internal quotation marks omitted). The mother testified at the termination hearing that she was on track to complete an associate's degree before her release and had both employment and housing arranged. *Id.* at 1263. Furthermore, the mother "maintained a consistent, positive relationship" with the child and demonstrated a "commitment to reunification with [the child] from the very point of her arrest," even repeatedly attempting to arrange for

relative care of the child during her incarceration. *Id.* at 1264-65. At the time of the termination order, the mother's release was approximately one year away, and the supreme court, considering the child's best interests, determined that there was no reason that permanency could not be delayed in light of "the positive steps [the mother] has taken while incarcerated, her demonstrated commitment and interest in maintaining a parental relationship with [the child], and her willingness to continue to participate in parenting and other personal improvement programs after her release." *Id.* at 1265.

[23] A few years later, in *K.E.*, 39 N.E.3d at 648, our supreme court found insufficient evidence of a reasonable probability that the father would not remedy the conditions resulting in the removal of his children where the father, who was incarcerated after a methamphetamine lab was discovered in his home, "made substantial efforts towards bettering his life through programs that were available during his incarceration." The father "completed twelve programs"—most voluntarily and without the benefit of a sentence reduction. *Id.* The programs "particularly targeted parenting and life skills," as well as substance abuse. *Id.* at 649. While incarcerated, the father enjoyed regular visits with his children and called them "nightly." *Id.* "[T]here [was] seemingly nothing else that [the father] could have been doing to demonstrate his dedication to obtaining reunification." *Id.* At the time of the termination hearing, the father's release date "was still over two years away," but the supreme court indicated that "the potential release date is only one

consideration of many that may be relevant in a given case." *Id.* at 648. The court stated:

> We do not seek to establish a higher burden upon incarcerated parents based upon their possible release dates nor do we believe the burden of proof should be reduced merely because a parent is incarcerated. Because the release date alone is not determinative, we consider whether other evidence, coupled with this consideration, demonstrates by clear and convincing evidence a reasonable probability that [the parent] would be unable to remedy the conditions for removal.

*Id.*

[24] In the present case, Father's crimes occurred after the Child's birth and resulted in a twelve-year executed sentence. At the time of the termination hearing, Father had nearly four more years on his sentence, which he indicated could be reduced by one year if he completed a GED class. While incarcerated, Father claimed to have completed a parenting class—although he could not recall the contents of the class by the time of the termination hearing—and an anger management class, and he began a literacy course. He hoped to complete the GED class prior to his release. There is also evidence that he, for some time, called the Child once per week. Despite indicating that he did not have money in his account to continue calling the Child, evidence was presented that Father maintained phone contact with his brother until two weeks prior to the termination hearing. While we recognize that in-person visits with the Child were not within Father's control, there is no evidence that Father wrote the

Child letters or otherwise attempted to develop his relationship with the Child after discontinuing the once-weekly calls.

[25] Father fails to recognize the distinctions between his case and that of *In re G.Y.* and *K.E.* in that Father did *not* undertake to avail himself of every opportunity to demonstrate his dedication to reunification with the Child. DOC policy allows inmates to enroll in only one course at a time and prohibits individuals housed in the administrative segregation unit from participating in the various classes. Instead of maintaining focus on completing courses and meaningfully working toward reunification, Father repeatedly violated DOC rules, resulting in at least fifteen write-ups, and even assaulted another inmate. Thus, by virtue of his own misconduct, Father was precluded from participating in any courses for a period of at least eighteen months while he was confined to the administrative segregation unit. Father's criminal actions also resulted in the loss of one year of credit time. *See Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (recognizing that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children"), *trans. denied*. Furthermore, it is apparent that Father failed to internalize the lessons taught in his anger management course, and we can therefore infer that Father also failed to implement the teachings of his parenting class. In addition, Father made no effort to maintain regular contact with DCS to stay involved in the case. Accordingly, we cannot say that the trial court clearly erred in finding that Father failed to meaningfully participate in services and comply with the

dispositional order. Father now complains that the breakdown in communication was the fault of DCS, but it was Father's responsibility to demonstrate a commitment to reunification with his Child.

[26] The parents in *In re G.Y.* and *K.E.* had specific, attainable plans for housing and supporting their children upon release. Here, Father thinks that he can "probably" stay with his mother or grandmother upon release. (Tr. Vol. II, p. 79). There is no basis in the record for finding that such a plan for housing would be inappropriate except that Father's testimony indicates that he has not actually confirmed whether he (and the Child) would be permitted to live with his mother or grandmother. He also wants to "open me up like a little nacho stand something like that," notwithstanding the fact that, prior to incarceration, Father did little more than intermittently wash cars whenever he decided that he needed money. (Tr. Vol. II, p. 79). He instead apparently relied on other resources and the gratuity of others (namely, his mother's social security income and the use of her apartment) to make sure that the Child and his half-siblings "had food in they belly [and] clothes on they back." (Tr. Vol. II, p. 81). At the time of the termination hearing, Father had been incarcerated for nearly four years. Instead of taking advantage of every opportunity to establish that he could provide for the necessary care and support of the Child soon after his release, Father broke the rules and engaged in additional criminal conduct, disqualifying himself from programs and opportunities to prepare for life outside of prison. As the Child was removed based on his parents' inability to provide for his basic needs, we find that the evidence supports the trial court's

determination that there is a reasonable probability that Father will not remedy the conditions that resulted in the Child's removal and continued placement outside of the home.

### B. *Best Interests of the Child*

[27] Father also challenges the trial court's conclusion that termination is in the Child's best interests. The parent-child relationship is undoubtedly "one of the most valued relationships in our culture." *Bester*, 839 N.E.2d at 147 (quoting *Neal v. DeKalb Cnty. Div of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Accordingly, the purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S.*, 987 N.E.2d at 1158. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. Permanency is a central consideration in determining a child's best interests. *Id.*

[28] Father acknowledges that DCS and the two CASAs assigned to the case all recommended that termination of his parental rights would serve the Child's best interests. DCS and the CASAs emphasized the Child's need for permanency—given the significant time elapsed since removal—and that he would suffer additional trauma if separated from T.F. and A.F. All agreed that

the Child is in a "wonderful" foster placement, and the foster mother has agreed to adopt all three children. (Tr. Vol. II, p. 58). Nevertheless, Father now argues that "[t]he general idea that children need permanency is not sufficient to prove that [the Child] would be harmed by remaining with the care giver without termination and adoption while his Father completed his sentence and services." (Appellant's Br. p. 16). Father also contends that he "has pursued programs to better himself and to be a better parent[, and his] interactions with [the Child] are healthy and the two are bonded." (Appellant's Br. p. 17). He adds that there is nothing in the record to suggest that Father living with his mother and grandmother upon release, or Father's past criminal history, would pose a threat to the Child.

[29] At the time of the termination hearing, the Child was almost six years old, and Father had been incarcerated since the Child was two years old. During that time, Father demonstrated more of a commitment to violating DOC's rules than to reunifying with the Child. It is well established that "[a] parent's historical inability to provide a suitable environment, along with the parent's current inability to do the same, supports finding termination of parental rights is in the best interests of the children." *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). Moreover, the testimony of the DCS caseworker and child advocates is sufficient to support the trial court's conclusion that termination is in the Child's best interests. *See McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). While Father correctly notes that termination is not appropriate simply because a better home might be

available, the fact remains that the Child's foster mother can provide him with the consistent care and stability that Father cannot. We find there is sufficient evidence to support the trial court's determination that termination is in the Child's best interests.

# CONCLUSION

[30] Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's termination of Father's parental rights to the Child.

[31] Affirmed.

[32] Baker, J. and Brown, J. concur